FILED

2022 Mar-11  PM 02:02
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **RICHARD G. JUNKINS,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 5:17-cv-00350-MHH** |
| | } | |
| **DANIEL DE JONG,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

In this § 1983 action, Richard Junkins asserts that Madison County Deputy Sheriff Daniel De Jong violated his rights under the Fourth Amendment when Deputy De Jong arrested him. Mr. Junkins seeks damages to compensate him for the alleged violation of his constitutional rights.[1]

Early in this litigation, relying on the affirmative defense of qualified immunity, Deputy De Jong moved to dismiss Mr. Junkins's § 1983 claim. Deputy De Jong argued that "because the complaint affirmatively alleges facts showing that there was probable cause or arguable probable cause for [Mr.] Junkins'[s] arrest for public intoxication," there was no false arrest and, therefore, no violation of Mr.

---

[1] Mr. Junkins contends that Deputy De Jong was acting in his individual capacity when the alleged constitutional violation occurred.

Junkins's rights under the Fourth Amendment. (Doc. 34, p. 2, ¶ 4). The Court

denied Deputy De Jong's motion to dismiss, stating:

> On an evidentiary record, the Court may reach a different conclusion,
> but at this stage of the litigation, viewing the allegations in the amended
> complaint in the light most favorable to Mr. Junkins, Mr. Junkins has
> demonstrated that [Deputy De Jong] lacked arguable probable cause to
> arrest him for public intoxication.

(Doc. 50, p. 10) (footnote omitted).

The parties now have completed discovery, and Deputy De Jong has moved

for summary judgment. (Doc. 72). Relying on evidence developed in discovery,

Deputy De Jong argues again that he is entitled to qualified immunity because there

was probable cause or arguable probable cause to arrest Mr. Junkins for public

intoxication. (Doc. 73, pp. 30-31, 36). Deputy De Jong also argues that there was

probable cause or arguable probable cause to arrest Mr. Junkins for disorderly

conduct, (Doc. 73, pp. 21-29, 32-35); harassment, (Doc. 73, p. 29); and resisting

arrest, (Doc. 73, pp. 29-30, 35-36). This opinion resolves Deputy De Jong's motion

for summary judgment.

This opinion begins with a discussion of the standard that a district court uses

to evaluate motions for summary judgment. Then, consistent with the summary

judgment standard, the Court summarizes the evidence that the parties have

submitted, describing the evidence in the light most favorable to Mr. Junkins.

Finally, the Court discusses the standards that govern Fourth Amendment claims for false arrest and evaluates the summary judgment evidence under those standards.

## I.

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  To demonstrate that a genuine dispute as to a material fact precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  FED. R. CIV. P. 56(c)(1)(A).  "The court need consider only the cited materials, but it may consider other materials in the record."  FED. R. CIV. P. 56(c)(3).

When considering a summary judgment motion, a district court must view the evidence in the record and draw reasonable inferences from the evidence in the light most favorable to the non-moving party.  *Sconiers v. Lockhart*, 946 F.3d 1256, 1260 (11th Cir. 2020); *Shaw v. City of Selma*, 884 F.3d 1093, 1097 n.1 (11th Cir. 2018).  Because there is police body camera footage in the record, the Court will "accept facts clearly depicted in [the] video recording even if there would otherwise be a

genuine issue about the existence of those facts." *Shaw*, 884 F.3d at 1097 n.1 (citing *Scott v. Harris*, 550 U.S. 372, 380-81 (2007)). "[W]here the recording does not clearly depict an event or action, and there is evidence going both ways on it," the Court will credit Mr. Junkins's version of what happened.

## II.

March 6, 2015 was a tragic day for Mr. Junkins and his wife. That morning, the mobile home where Mr. Junkins lived with his wife, Angela Holder, and their dog, Mr. Bear, caught fire and burned. (Doc. 69-3, pp. 77-78, tpp. 75-76). Mr. Junkins and Ms. Holder lost their personal possessions in the fire. (Doc. 69-3, p. 78, tp. 76). Mr. Junkins, Ms. Holder, and Mr. Bear visited the Red Cross where they received motel vouchers. (Doc. 69-3, p. 92, tp. 90). The motel would not allow Mr. Bear to stay in Mr. Junkins's room, so Mr. Junkins returned to his property with Ms. Holder and Mr. Bear to stay in a double-wide trailer on the property. (Doc. 69-3, p. 92, tp. 90).

Late that evening, while Mr. Junkins and Mr. Bear were outside, Mr. Bear "start[ed] running towards the highway." (Doc. 69-3, p. 92, tp. 90). Mr. Junkins chased after Mr. Bear. (Doc. 69-3, p. 92, tp. 90). As he neared the highway, Mr. Junkins saw a car approaching. (Doc. 69-3, pp. 92-93, tpp. 90-91). To protect Mr. Bear, Mr. Junkins waved his arms toward the car, hoping to get the car to stop. (Doc. 69-3, p. 93, tp. 91). Anthony Swinford was driving the car; his wife was in the

passenger seat.  (Doc. 69-2, p. 2, ¶¶ 2-3).  Mr. Swinford saw Mr. Junkins waving his arms, drove past him, turned around, and then drove back toward him.  (Doc. 69-2, pp. 2-3, ¶¶ 3-4).  After Mr. Swinford drove past Mr. Junkins but before Mr. Swinford turned around, Mr. Junkins laid down, and at least part of his body was in the road.  (Doc. 69-2, p. 3, ¶ 4; Doc. 69-3, pp. 97-106, tpp. 95-104).  As Mr. Swinford drove back toward Mr. Junkins, Mr. Junkins began to sit up.  (Doc. 69-3, p. 106, tp. 104).  Mr. Swinford rolled down his window and asked Mr. Junkins if he needed assistance.  (Doc. 69-2, p. 3, ¶ 5).  Mr. Junkins told Mr. Swinford to keep driving.  (Doc. 69-2, p. 3, ¶ 5).

Mr. Swinford's wife called 911.  (Doc. 69-2, p. 3, ¶ 5).  She asked for a deputy to come to the scene because she and Mr. Swinford were concerned about Mr. Junkins and the danger he was posing to himself and motorists.  (Doc. 69-2, p. 3, ¶ 5).  Mr. Swinford turned around again, stopped, and put on his four-way flashers to protect Mr. Junkins from vehicles traveling down the road.  (Doc. 69-2, p. 3, ¶ 5).

Meanwhile, Deputy De Jong, who was on duty and conducting patrol, "received dispatch instructions from Madison County 911 to respond to Wall Triana Highway, just north of Ready Section Road, where the 911 caller advised there was a man laying in the roadway" who "was not responding to the caller."  (Doc. 69-1, pp. 2-3, ¶ 3).  It was just before 11:00 p.m.  (Doc. 69-1, p. 2, ¶ 3).  During the five minute trip to Wall Triana Highway, Deputy De Jong received the following updates

from the 911 dispatcher: "CALLER ADV MAN LAYING IN ROADWAY" at 10:54:26 p.m. CST; "LAYING ON WALL TRIANA" at 10:55:28 p.m. CST; and "ADV SUBJ GOT UP AND WALKED TOWARDS MOBILE HOME THAT HAD 11633 ON MAILBOX AND WAS YELLING TOWARDS THE MOBILE HOME." (Doc. 69-1, p. 3, ¶ 3; Doc. 69-1, pp. 19-20).  When Deputy De Jong arrived at the scene, Mr. Swinford told him that Mr. Junkins "had gotten up out of the road moments before [] and walked onto the property at 11623 Wall Triana Highway." (Doc. 69-1, pp. 4-5, ¶ 6).  Deputy De Jong spotted Mr. Junkins on the property, yelling loudly.  (Doc. 69-1, p. 5, ¶ 6).  The yelling could be heard from the highway. (Doc. 69-1, p. 5, ¶ 6; Doc. 69-2, p. 5, ¶ 11; Doc. 69-3, Ex. 5, 0:00:30).

Deputy De Jong entered the property, approached Mr. Junkins, and yelled "come here" three times.  All the while, Mr. Junkins yelled loudly and unintelligibly. (Doc. 69-3, Ex. 5, 0:00:31, 0:00:44, 0:00:50).  After the third "come here," Mr. Junkins appeared to yell "stay out, stay out" or "stay off, stay off" at Deputy De Jong.  (Doc. 69-3, Ex. 5, 0:00:54-0:00:55).  As Deputy De Jong slowly approached Mr. Junkins, Mr. Bear started barking and ran toward Deputy De Jong.  (Doc. 69-3, Ex. 5, 0:01:06-0:01:09).  When Mr. Bear was several feet from Deputy De Jong, Deputy De Jong fired his service weapon at Mr. Bear.  (Doc. 69-3, Ex. 5, 0:01:09). Mr. Bear whimpered and ran away.  (Doc. 69-3, Ex. 5, 0:01:10).

After Deputy De Jong fired his service weapon at Mr. Bear, Mr. Junkins became irate.  He started to approach Deputy De Jong, screaming "you shot my goddam dog;" "you son of bitch;" "you motherfucker;" "I will kill you;" "fuck you;" "you will goddam die;" "shoot me;" "you better hope you did not shoot my dog;" and "my house burned down today."  (Doc. 69-3, Ex. 5, 0:01:10-0:02:30).[2]  Deputy De Jong repeatedly commanded Mr. Junkins to "get on the ground," but Mr. Junkins did not comply.  (Doc. 69-3, Ex. 5, 0:01:10-0:04:20).  Eventually additional law enforcement officers arrived.  (Doc. 69-3, Ex. 5, 0:03:35).  After about four minutes, Mr. Junkins allowed Deputy De Jong and another law enforcement officer to secure him.  (Doc. 69-3, Ex. 5, 0:04:25).  The officers then placed Mr. Junkins in handcuffs.  (Doc. 69-3, Ex. 5, 0:04:45).  The yelling continued while the officers escorted Mr. Junkins from his property and placed him in a police car.  (Doc. 69-3, Ex. 5, 0:04:45-0:07:48).  Once in handcuffs, Mr. Junkins mostly expressed how distraught he was that his house had burned, and his dog had died.  For the most part, Mr. Junkins

---

[2] When Mr. Junkins becomes clearly visible in the video, he is shirtless.  In his declaration, Deputy De Jong states that it was very cold that night.  (Doc. 69-1, p. 4, ¶ 6).  Footage from Deputy De Jong's body camera contains several features that confirm that it was cold, and Mr. Junkins had removed his shirt.  (Doc. 69-3, Ex. 5).  Deputy De Jong mentioned to other officers who appeared at the scene that he believed that Mr. Junkins and Ms. Holder were drunk.  (Doc. 69-3, Ex. 5).  In her deposition, Ms. Holder testified that she had not been drinking the afternoon of March 6, (Doc. 69-6, p. 26, tp. 25), but footage from Deputy De Jong's body camera reveals that Ms. Holder told Deputy De Jong that she had been drinking that night, (Doc. 69-3, Ex. 5, 0:19:28-0:19:31).  For reasons discussed later in this opinion, to resolve Deputy De Jong's summary judgment motion, the Court does not have to determine whether Deputy De Jong had probable cause or arguable probable cause to conclude that Mr. Junkins was publicly intoxicated.

stopped threatening Deputy De Jong and the other officers.  Two EMS officers arrived on the scene, and Deputy De Jong asked them to examine Mr. Junkins and Ms. Holder to make sure they were okay.  (Doc. 69-3, Ex. 5, 0:17:45-0:17:49).

After Mr. Junkins had been in the police car for just over 20 minutes, Deputy De Jong said to another officer "I still have PC to arrest him but I'm trying to go to Red Cross and have Red Cross take care of him."  (Doc. 69-3, Ex. 5, 0:30:05-0:30:12).  After he spoke to Ms. Holder, Deputy De Jong learned that Mr. Junkins and Ms. Holder already had visited the Red Cross and received a seven-day voucher to stay at a Budget Inn.  (Doc. 69-3, Ex. 8, 0:00:54-0:00:59).  Deputy De Jong then notified another officer that he was "going to try to get them to a hotel."  (Doc. 69-3, Ex. 8, 0:06:06-0:06:08).  Deputy De Jong opened the rear passenger door of the police car where Mr. Junkins was seated and asked:  "Is it alright with you if we drive you to the Budget Inn so we can get you warm, so we can get you out of this cold, get you dry, get you a shower, and get you a good night's rest?  And you can come back tomorrow and take care of what you got to take care of over here?"  (Doc. 69-3, Ex. 8, 0:07:29-0:07:44).  In response, Mr. Junkins repeatedly asked whether Deputy De Jong had killed Mr. Bear; Mr. Junkins did not acknowledge Deputy De Jong's offer to take him to the Budget Inn.  (Doc. 69-3, Ex. 8, 0:07:54-0:09:09).  Deputy De Jong repeatedly replied that he did not know whether he killed Mr. Bear.  (Doc. 69-3, Ex. 8, 0:07:54-0:09:09).  Deputy De Jong then spoke to other officers

on the scene and decided he had no choice but to "book" Mr. Junkins. (Doc. 69-3, Ex. 8, 0:09:10-0:09:20). Deputy De Jong stated that he could not safely leave Mr. Junkins on his property. (Doc. 69-3, Ex. 5, 0:15:34-0:15:38). Deputy De Jong clarified that he was arresting Mr. Junkins for disorderly conduct. (Doc. 69-3, Ex. 8, 0:15:35-0:15:37).

After Deputy De Jong arrested Mr. Junkins for disorderly conduct, the county prosecutor charged Mr. Junkins with obstructing traffic under ALA. CODE § 13A-11-7(a)(5). (Doc. 69-1, p. 11, 14, ¶¶ 15, 19). Mr. Junkins was convicted of disorderly conduct in state district court. (Doc. 69-1, p. 14-15, ¶ 19; Doc. 69-1, p. 34). Mr. Junkins then appealed to the Circuit Court and received a jury trial on the charge against him. The jury acquitted Mr. Junkins of the charge. (Doc. 69-1, p. 15, ¶ 19).

## III.

When Deputy De Jong responded to the 911 call regarding a man lying in the road and eventually arrested Mr. Junkins for disorderly conduct, Deputy De Jong was acting within the scope of his discretionary functions.[3] "Qualified immunity

---

[3] "'To establish that the challenged actions were within the scope of his discretionary authority, a defendant must show that those actions were (1) undertaken pursuant to the performance of his duties, and (2) within the scope of his authority.'" *Estate of Cummings v. Davenport*, 906 F.3d 934, 940 (11th Cir. 2018) (quoting *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1282 (11th Cir. 1998)). "In other words, '[w]e ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize.'" *Estate of Cummings*, 906 F.3d at 940 (quoting *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004)). Mr. Junkins acknowledges that his arrest falls within the scope of Deputy De Jong's discretionary functions. (Doc. 77, p. 19).

offers complete protection for individual public officials performing discretionary functions 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Sherrod v. Johnson*, 667 F.3d 1359, 1363 (11th Cir. 2012) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). If the record demonstrates that a public official was "acting within the scope of his discretionary authority when the allegedly wrongful acts occurred," then, to avoid the affirmative defense of qualified immunity, a plaintiff must establish that the defendant violated his constitutional rights and that the constitutional rights violated were "clearly established" at the time of the alleged wrongdoing. *Loftus v. Clark-Moore*, 690 F.3d 1200, 1204 (11th Cir. 2012) (internal citations and quotation marks omitted).

As mentioned, Mr. Junkins contends that Deputy De Jong violated his Fourth Amendment right to be free from unlawful arrest. "An arrest made without probable cause is a violation of an arrestee's clearly established Fourth Amendment rights." *Windham v. City of Fairhope*, 597 Fed. Appx. 1068, 1071 (11th Cir. 2015) (citing *Redd v. City of Enterprise*, 140 F.3d 1378, 1382 (11th Cir. 1998)). "Probable cause exists when 'facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Windham*, 597 Fed. Appx. at 1071

(quoting *Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002)).  In the context of a § 1983 action, "a police officer may be entitled to qualified immunity even if there was no actual probable cause for an arrest, so long as there was *arguable* probable cause. *Windham*, 597 Fed. Appx. at 1071 (citing *Durruthy v. Pastor*, 351 F.3d 1080, 1089 (11th Cir. 2003)) (emphasis in *Windham*).  "'Arguable probable cause exists where reasonable officers in the same circumstances and possessing the same knowledge as the Defendant could have believed that probable cause existed to arrest.'"  *Windham*, 597 Fed. Appx. at 1071-72 (quoting *Rushing v. Parker*, 599 F.3d 1263, 1266 (11th Cir. 2010)).

As noted, Deputy De Jong contends that there was probable cause or arguable probable cause to arrest Mr. Junkins for four offenses:  public intoxication; disorderly conduct; harassment; and resisting arrest.  Because Mr. Junkins was ultimately charged with and convicted of disorderly conduct (before being acquitted on appeal), (Doc. 69-1, p. 14-15, ¶ 19; Doc. 69-1, p. 34), the Court begins its analysis there.  Under Alabama law:

> (a) A person commits the crime of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he or she does any of the following:
>
> (1) Engages in fighting or in violent tumultuous or threatening behavior.
>
> (2) Makes unreasonable noise.
>
> (3) In a public place uses abusive or obscene language or makes an obscene gesture.

(4) Without lawful authority, disturbs any lawful assembly or meeting of persons.

(5) Obstructs vehicular or pedestrian traffic, or a transportation facility.

(6) Congregates with other person in a public place and refuses to comply with a lawful order of law enforcement to disperse.

ALA. CODE § 13A-11-7(a) (1975).  Deputy De Jong argues that there was probable cause or arguable probable cause to arrest Mr. Junkins under subsections (a)(1), (a)(2), (a)(3), and (a)(5).  (Doc. 73, p. 25).

Mr. Junkins argues that Deputy De Jong did not have arguable probable cause to arrest him because intent, namely "intent to cause public inconvenience, annoyance or alarm," is an element of the crime of disorderly conduct under § 13A-11-7(a), and Deputy De Jong did not observe conduct consistent with "intent to cause public inconvenience, annoyance or alarm."   Though he acknowledges that he "curs[ed] . . . loudly," Mr. Junkins contends that "he did not do so with the intention to cause any detriment to the public which is evidenced by the fact that he was on his own property and remained there the entire time away from the public."  (Doc. 77, p. 23).[4]  According to Mr. Junkins, under the totality of the circumstances,

---

[4] With respect to subsection (a)(3), Mr. Junkins argues that "abusive or obscene language" only applies to "fighting words," which Mr. Junkins contends he did not use.  (Doc. 77, pp. 23-24).  Mr. Junkins overlooks the recording in which he yelled at Deputy De Jong:  "you motherfucker;" "I will kill you."  (Doc. 69-3, Ex. 5, 0:01:10-0:02:30).

Deputy De Jong should have realized that he (Mr. Junkins) was distraught that his home had burned down and that he had no intent to cause harm.[5]

Mr. Junkins's argument concerning intent is not persuasive. "While intent is an element of the crime which must be proved at trial, it is not necessary in order to establish probable cause to arrest." *U.S. v. Everett*, 719 F.2d 1119, 1120 (11th Cir. 1983).[6] Mr. Junkins may have acted intentionally. He may have acted recklessly. Or, given the terrible ordeal that he experienced that day, Mr. Junkins may have been distraught and incoherent, so that he was not aware of his conduct or the possible consequences of his conduct. But under Eleventh Circuit precedent, when Deputy De Jong assessed whether he had probable cause to arrest Mr. Junkins for disorderly conduct, he did not have to consider whether Mr. Junkins possessed the requisite

---

[5] In making this argument, Mr. Junkins overlooks the fact that an individual may violate § 13A-11-7(a) and commit the crime of disorderly conduct by "recklessly creating a risk" of "public inconvenience, annoyance or alarm" while engaging in conduct that satisfies one of the six subsections of § 13A-11-7(a).

[6] More recently, the Eleventh Circuit stated:

> Of course, no police officer can truly know another person's subjective intent. But that Plaintiff did, in fact, [produce the proscribed result] is undisputed. And that fact provides some evidence to believe that Plaintiff intended to [produce the proscribed result]. *See United States v. Martinez*, 96 F.3d 473, 478 n. 7 (11th Cir. 1996) ("'[A]cts indicate the intention' is an old maxim"). Beyond that, an officer would need no further evidence of Plaintiff's intent to cause Plaintiff's arrest. No officer has a duty to prove every element of a crime before making an arrest. *Scarbrough v. Myles*, 245 F.3d 1299, 1302-03 (11th Cir.2001). "Police officers are not expected to be lawyers or prosecutors." *Id.* at 1303 n. 8.

*Jordan v. Mosley*, 487 F.3d 1350, 1355 (11th Cir. 2007).

mental state under the criminal statute.  Thus, in evaluating arguable probable cause, the Court does not have to consider what a reasonable officer would understand regarding Mr. Junkins's mental state.

Here, Deputy De Jong had arguable probable cause to arrest Mr. Junkins for causing or creating a risk of "public inconvenience, annoyance or alarm" by "[o]bstruct[ing] vehicular . . . traffic."  ALA. CODE § 13A-11-7(a)(5).  According to Mr. Swinford, when he first came upon Mr. Junkins, Mr. Junkins was standing in the highway waving his arms.  (Doc. 69-2, p. 2, ¶ 3).  Then, according to Mr. Swinford, Mr. Junkins "laid down in the road and was in the northbound lane with his back to [them].  He was laying across the lane, and his head was close to the center line of the highway."  (Doc. 69-2, p. 3, ¶ 4).  Mr. Junkins acknowledges that he "laid down" in the road; he disputes only how much of his body was in the road. (Doc. 69-3, pp. 104-05, tpp. 102-03).  Ms. Swinford called 911 to request police assistance because Mr. Junkins was in the road.  (Doc. 96-2, p. 3, ¶ 5).  Deputy De Jong received dispatch instructions regarding a man lying in Wall Triana Highway. (Doc. 69-1, pp. 2-3, ¶ 3; Doc. 69-1, p. 19).  Ms. Swinford remained on the line with 911 while Deputy De Jong made his way to the scene.  A few minutes into the call, Ms. Swinford advised 911 that the subject got up and walked towards a mobile home and began yelling.  The 911 dispatcher conveyed the information to Deputy De Jong. (Doc. 69-1, p. 20).  When he arrived at the scene, Deputy De Jong saw "a vehicle

stopped in the roadway with its hazard lights on." (Doc. 69-1, p. 4, ¶ 6). Deputy De Jong approached the vehicle, and Mr. Swinford told Deputy De Jong that Mr. Junkins had just gotten up from the road and was standing on the adjacent property, yelling. (Doc. 69-1, pp. 4-5, ¶ 6).

The information that 911 dispatch conveyed to Deputy De Jong, Deputy De Jong's observation of the Swinfords' vehicle stopped in the roadway with its hazard lights on, and Deputy De Jong's conversation with Mr. Swinford at the scene provided Deputy De Jong "reasonably trustworthy information" sufficient to establish probable cause for a warrantless arrest for obstructing vehicular traffic under § 13A-11-7(a)(5). *Ortega v. Christian*, 85 F.3d 1521, 1525 (11th Cir. 1996). A reasonable officer in Deputy De Jong's position could so conclude.[7]

Similarly, Deputy De Jong had arguable probable cause to arrest Mr. Junkins for causing or creating a risk of "public inconvenience, annoyance or alarm" by "[m]ak[ing] unreasonable noise." ALA. CODE § 13A-11-7(a)(2). As mentioned, while Deputy De Jong was enroute to the scene, the 911 dispatcher informed him that the caller reported that Mr. Junkins "got up and began yelling and walking toward a mobile home." (Doc. 69-1, p. 3, ¶ 4; *see also* Doc. 69-1, p. 20). When Deputy De Jong arrived at the scene, he observed Mr. Junkins walking on his

---

[7] Another officer at the scene told Deputy De Jong that there was probable cause to arrest Mr. Junkins. (Doc. 69-3, Ex. 5, 0:30:14-0:30:16) ("You got PC on [Mr. Junkins], you can detain him.").

property and yelling loudly.  (Doc. 69-1, p. 5, ¶ 6).  The footage from Deputy De Jong's body camera demonstrates that Mr. Junkins yelled loudly from the moment Deputy De Jong arrived on the scene until Mr. Junkins was placed in a police car. (Doc. 69-3, Ex. 8, 0:00:33-0:07:28).  The footage demonstrates that Mr. Junkins's shouts of profanity could be heard from the public road.  Cellphone video taken by Mr. Junkins's neighbor demonstrates that Mr. Junkins could be heard clearly from his neighbor's property.  (Doc. 69-4, Ex. A, 0:00:00-0:02:50).

Given this conduct, which took place in a residential area, a reasonable officer in Deputy De Jong's position could conclude that Mr. Junkins was "[m]aking unreasonable noise" and causing "public inconvenience, annoyance or alarm" for the neighbors, satisfying the conduct and result elements of ALA. CODE § 13A-11-7(a)(2).[8]  Thus, based on the totality of the circumstances, "a prudent person [could]

---

[8] In *Fuqua v. Hess*, the district court explained:

> Several court decisions delineate circumstances where probable cause exists to effect a disorderly conduct arrest for making an unreasonable noise. *See Redd v. City of Enterprise*, 140 F.3d 1378, 1382-83 & n.4 (11th Cir. 1998) (officers had probable cause to arrest plaintiff for unreasonable noise based upon plaintiff's admission he attempted to be heard over traffic and spoke loudly enough to be heard across the street, and passers-by complained of the loudness); *Windham v. City of Fairhope*, 597 F. App'x 1068, 1072 (11th Cir. 2015) (plaintiff's repeated yelling at officers and to truck driver on a busy road, even if ultimately insufficient to sustain a conviction under the statute, provided arguable probable cause for officers to arrest her for disorderly conduct by making unreasonable noise); *Lewis v. Blue*, 774 F.Supp.2d 1164, 1180-81 (M.D. Ala. 2011 (arguable probable cause that plaintiff violated disorderly statute by "recklessly creating a risk" of "public annoyance" by "making unreasonable noise"; although plaintiff was on private property, she admitted she was loud in the use of "profane language that could also be heard on the street, by neighbors, and by anybody passing by"); *Hutchins v. City of*

believe . . . that [Mr. Junkins] [had] committed" the misdemeanor crime of disorderly conduct under § 13A-11-7(a)(2). *Windham*, 597 Fed. Appx. at 1071 (quoting *Lee*, 284 F.3d at 1195) (internal quotation marks omitted). For this additional reason, Deputy De Jong had arguable probable cause to arrest Mr. Junkins for disorderly conduct.

## CONCLUSION

For the reasons discussed above, as a matter of law, Deputy De Jong is entitled to qualified immunity. By separate order, the Court will enter judgment for Deputy De Jong on Mr. Junkins's false arrest claim under § 1983.[9]

---

*Alexander City*, 822 So.2d 459, 461-62 (Ala. Crim. App. 2000) (affirming a defendant's disorderly conduct conviction pursuant to the unreasonable noise prong based upon his screaming in a police station); *Sterling v. State*, 701 So.2d 71 (Ala. Crim. App. 1997) (probable cause supporting a disorderly conduct arrest existed when a defendant in a courthouse made unreasonable noise by loudly asking why the sheriff had denied defendant's application for a pistol permit.); *c.f. Walker v. Briley*, 140 F.Supp.2d 1249 (N.D. Ala. 2001) (fact issues existed as to probable cause for disorderly conduct arrest where plaintiff denied being loud or using profanity).

*Fuqua v. Hess*, Case No. 3:16-cv-01510-HNJ, 2019 WL 450835, *8 (N.D. Ala. Feb. 5, 2019).

[9] In contrast to its decision at the Rule 12(b)(6) stage of this litigation, the Court resolves the issue of qualified immunity in favor of Deputy De Jong at this summary judgment stage because the evidence now before the Court, particularly the body camera footage, contradicts Mr. Junkins's factual allegations in his amended complaint.

In his amended complaint, Mr. Junkins alleged that as Deputy De Jong walked toward his (Mr. Junkins's) burned residence shining a flashlight, the light frightened Mr. Bear, but the dog did not move toward Deputy De Jong. (Doc. 31, p. 3, ¶ 18). Mr. Junkins alleged that Deputy De Jong shot Mr. Bear twice, and he (Mr. Junkins) "became so overcome with emotion that he passed out." (Doc. 31, p. 3, ¶ 19). Mr. Junkins alleged that Deputy De Jong "falsely and maliciously reported in his report of the incident that the Plaintiff was extremely intoxicated." (Doc. 31, p. 4, ¶ 23).

**DONE** and **ORDERED** this March 11, 2022.

*Madeline H. Haikala*
_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE

_____

Mr. Junkins contends that Deputy De Jong acted maliciously and in bad faith in arresting him. (Doc. 31, p. 12, ¶ 81).

The body camera recording of Deputy De Jong's interaction with Mr. Junkins demonstrates that Mr. Bear charged Deputy De Jong. Though he was distraught and understandably so, Mr. Junkins did not pass out. Though Mr. Junkins may not have been intoxicated, Deputy De Jong had reason to believe that Mr. Junkins was intoxicated because of Mr. Junkins's behavior and because Mr. Junkins's wife acknowledged that she had been drinking. And body camera footage illustrates Deputy De Jong's efforts to care for Ms. Holder and to diffuse the situation with Mr. Junkins. Deputy De Jong tried to avoid arresting Mr. Junkins, but Mr. Junkins would not cooperate with Deputy De Jong's efforts to take Mr. Junkins to a hotel. Deputy De Jong did not believe that he could safely allow Mr. Junkins to remain at his property, so he arrested him for disorderly conduct. After observing Mr. Junkins's behavior in reaction to the tragic events of the day, no reasonable officer would have left Mr. Junkins alone on his property, especially after Mr. Junkins had shouted that the police officers should shoot him. Given this evidence, Deputy De Jong is entitled to judgment on Mr. Junkins's false arrest claim based on the affirmative defense of qualified immunity.